Case number 16-1097 Sierra Club et al. Petitioners v. Environmental Protection Agency et al. Robert E. U.K. Petitioners, Megan E. Greenfield, the Respondents Good morning. Good morning, Your Honors. My name is Robert E. U. K. I'm here representing the petitioners, the Sierra Club, Citizens for a Greater Denver, Luria-Swansea Community Association, and the Cross-Community Coalition. We're here challenging all three of EPA's attempts to amend and supersede the 2010 procedures that were promulgated for determining the design value of a project. The design value is the statistic that EPA uses to determine whether or not the resulting air quality will comply with or not comply with an ambient standard. The statute defines EPA's duty as promulgating criteria and procedures that, quote, demonstrate and assure conformity, unquote. The assurance of conformity, it was established by the 2010 procedures because it did not allow violations of the ambient standards when the emissions from a project were combined with the background air quality. You're getting into the substance, but there are jurisdictional issues which have to be surmounted before we reach the substance. All right. Well, the jurisdictional issues... There are three that come immediately to mind. One is, is there a binding rule that's been adopted? Second is the question of whether the particular projects that you're raising, your arguments could have any impact on the outcome. And I guess those two right away. Yes, Your Honor. With different answers for PM 2.5 and PM 10. Well, first of all, with regard to the question of whether or not the EPA's decision will have any impact turns on whether or not the guidance is binding. I think those two questions that you've... Well, that's necessary but not sufficient for there to be an impact. Right? If, for example, a particular project is in an area that is in clear attainment and not in maintenance either, then the whole question just doesn't arise, right? Yes, conformity does not apply in areas that are in attainment. With these projects, all of the projects here are in areas, either are in non-attainment or are maintenance areas. So that conformity does apply to projects. How did you get that? I mean, the record says that Denver is in attainment, and I'm talking about I-70, for the various PM 2.5 standards. Yes, it's a maintenance area. It was non-attainment during the 1980s and 90s. It was re-designated by EPA in 2002 as an attainment area. I'm not sure you're talking about PM 10. PM 10, yes. I'm talking about PM 2.5. PM 2.5 is an issue in Los Angeles with regard to the I-710 project. It's not one of the pollutants that's involved in the I-70 conformity determination. I'm sorry, are you on 2.5 or 10 now? When you turn to LA. For the pollutant PM 10, the two projects that engage that pollutant are in Denver and in Arizona. That's the I-70 expansion in Denver and the South Mountain Freeway in Phoenix. For PM 2.5, the project that involves PM 2.5 is the I-710 expansion in Los Angeles. Los Angeles is currently non-attainment for PM 2.5. Yeah, but wasn't the hotspot analysis for I-710 done in 2012, which is before the procedure you're challenging was no more than a gleam in someone's eye? No, Your Honor. First of all, keep in mind that the procedure that we're trying to defend here was promulgated in 2010, and EPA has taken some actions to try to Well before June 2012. Yes, and those are the procedures that we believe still should apply because EPA has not lawfully amended those procedures. Now with regard to The interesting thing is that that was applied and I-710 passed. No, the I-710 decision, Your Honor, is yet to be made. What we cited in the briefs Well, at least the environmental impact study. was from a draft EIS. Just in July of this year, a supplemental draft EIS is now published for that project, which includes a statement that the conformity determination for that project will be made later. It has not yet been made, but that supplemental draft EIS states that it will be made based upon EPA's 2015 revised or amended procedures. Does it say anything to indicate that the gap between 2010 and 2025 standards will impact that outcome? It says that it has not yet made a determination. I understand that, but these agencies do a lot of talk about what they see as the issues. Is there any clue that the difference between 2010 and 2015 is pivotal in that case? It's not clear at this point what the implications will be of the change. All they have stated is that they will apply the revised procedure. Right, but you have a burden of showing that makes a difference. Well, with regard to PM10, we clearly have done that with regard to both the I-70 and the southbound freeway projects. With PM10, you do appear to have a difficulty with the guidance. It seems really very open-ended. If some better system comes along, it should be a lot. Well, the guidance with regard to the conformity determination based upon the design value does not have that kind of flexibility built into it. Sir, what do you mean? I mean, in terms of which way of calculating the design value, they set forth an approach and then they say, you come along with something better, it should be applied. I'm paraphrasing, of course. Well, I would contest that characterization of it, Your Honor. For example, in EPA's characterization of the elements of a hotspot analysis, they describe them as necessary. EPA says, quote, The quantitative PM hotspot analyses need to be completed using the refined analysis procedures described in this guidance. I'm pointing to the passage of page 38 of the joint appendix. More advanced methods are being considered on a case-by-case basis by the EPA regional office, OTOQ, and OAQPS. Any alternative methods for calculating the PM10 design value must be evaluated and chosen through the process. This process is established by each area's interagency consultation procedures. I mean, I guess you could get more open-ended than that by just saying, do what you think is best and don't worry about what we've said here at all. But this is pretty close. The flexibility that... Now, admittedly, this refers only to PM10, but it does refer to PM10. The flexibility that EPA has defined for PM10 is limited to some very narrow circumstances involving the way in which the data are evaluated. Where do we get that from? We don't get that from this language. Are you saying you get that understanding from the way EPA actually operates? Because this language sounds non-binding. It sounds more than precatory, but maybe not. The text in... If we read this language from JA38, if we understood that to be EPA giving non-binding guidance, just hypothetically, let's imagine that's how we read this. What would be your response to that? What EPA has done is to prescribe the data that must be used, which is, in 2010, that they must use the highest background air quality value. And what the flexibility that EPA has described, which we discuss in the reply brief, says that they can... I guess I'm asking a hypothetical. Let's imagine we disagreed with your reading of this language, and we came to the conclusion that this language suggests that EPA was giving a great deal of discretion and was merely giving guidance and it was not binding in any way. Let's just imagine for the sake of... I'm not saying that's where we are, but I'm just trying to understand your argument. If that's the view we had, would you have a response to that to argue that, no, in fact, the PM10 guidance was actually binding? How would you make that argument if we disagreed with you on the reading of JA38? Is there another argument? Maybe there's not. Maybe that would be it. Well, I think the key issue here, Your Honor, is that the agency has not laid out alternative data that can be used. They've said you must use the highest background data. But, again, we're quarreling over... My question assumes that we disagree with your reading of it, so let's go to the reading of it. Any alternative methods... It clearly says you can use alternative methods. You don't have to use these. I presume they're saying we prefer that you do, but you can come up with your own methods and we'll look at those. Maybe I'm misreading it. That's how I read any alternative methods for calculating design value. What is wrong with my reading? Let's see if I can find the text that we quoted. I'm looking at JA38 where Judge Williams was reading from. First of all, I think we need to look at this in the context of the case law where EPA... where this court has held in a similar circumstance, particularly in the General Electric case, where EPA did identify some alternative procedures that were available to the primary procedure prescribed, that the court held that where the agency had made an established procedure and acknowledged that there might be some exceptions to that, that that circumstance in and of itself is not enough to take it out of being a prescriptive document that triggered the obligation for notice and comment. Isn't there a difference between saying, here's the process. Conceivably grounds for an exception may be shown. We're open to that. This is rather broader. This is saying you may come up with something completely different and better. That seems to me more... that has extraordinarily open-ended quality to me. But that's not what EPA has done here. What they've done is to fundamentally change... It contradicts what I would say is the ordinary reading of that passage. But it's not that they've acknowledged a specific alternative in these cases. No, no. Although actually in the background there is a specific alternative. We won't go into that. But this seems to be forward-looking and open to findings of a better way. But what they've done here is to acknowledge a different procedure than the one that was promulgated in 2010. And that this procedure has the consequence of allowing projects that will actually contribute to violations of the ambient standard. Well, assuming you're right that the 2010 procedure is clearly correct. But we don't get to that if it's not binding. Binding is a necessary but not sufficient condition of our reaching that issue. Well, arguably it's binding because the agency said that this is the procedure you will follow unless you submit an alternative that we will review and determine is adequate. That's what this process plays out. The language there is remarkably broad. It must be evaluated and chosen through the process established by each area's interagency consultation procedures. That's what it sounds like. This is a procedure. They apparently vary from area to area under a particular set of regs. And all these agencies set up something new and better, fine. Even if it were just exclusively the EPA that had the final deciding voice, I think the openness would be there. Well, I think in many respects this is similar to the process EPA established in the McLuth case where you wrote the opinion, where EPA said that we will apply this model generally to make a determination for leachate, but that we will not consider it binding. And you determined that it was sufficiently prescriptive. I went back to my opinion there naturally, and I thought that the provision for an exception was quite narrowly framed. It wasn't just come up with something better if you can, and suggested that it would be an exception rather than an improvement that the agency was inviting. Well, I think it is analogous to the extent the agency tried to reserve the option of giving some weight to the modeling. And your determination was that it was sufficiently prescriptive as a starting point to trigger the EPA obligation for rulemaking. And I think that's the same situation that we have here, that EPA has described a prescriptive procedure. And while it does acknowledge there is an opportunity for someone to propose an alternative, until EPA reviews that and accepts it, the prescriptive procedure applies. And that's what makes it binding for purposes of triggering EPA review, both from the initial standpoint of adopting the 2010 rules, which were required under the ruling in Appalachian Power, because it fundamentally changed the legal regime that governed conformity determinations. So having gone through notice and comment to establish it, they should, under Perez, go through notice and comment to change it. I'd like to reserve the remainder of my time. All right. Thank you. Ms. Greenfield? May it please the Court. My name is Megan Greenfield, and I'm here on behalf of EPA. With me at Council's table is Susmita Dubey from the Office of General Counsel. This Court should dismiss the petition for review because subject matter jurisdiction is lacking for two related reasons. First, the 2015 hotspot guidance is not final action of the administrator, as is required for jurisdiction under Section 307 of the Clean Air Act. The guidance is not legally binding on EPA or on the agencies that apply it. And second, because the guidance is not legally binding, petitioners lack standing. Their injuries are not redressable. That is, even if this Court were to vacate the guidance, agencies could rely on the same- I'm sorry. As you framed that, it seems to be one reason. It's not binding, they don't have standing, and it's unreviewable. But that's one thing. That's a proposition that's not binding. I thought you were going to have a second reason for lack of jurisdiction. Judge Williams, you're correct. It collapses into a single question of the legally binding effects of the guidance. So if the guidance is not legally binding- I thought large portions of your brief were directed at the proposition that because of the facts in these particular highway programs, even if it were binding, the petitioners would not have standing. So you're right that in our opening brief we made an argument on injury related to the I-70 project. And there we said that the injury was speculative because no final decision had been made for that project yet. We concede now that a decision was made, and we apprise the Court of that in our 28J letters. So to the extent the question there was whether or not the injury was speculative, we concede that there has been harm, though we maintain that the injury is not redressable because the guidance is not binding. Well, what about your argument on I-710? So on I-710, that's true. There has been no decision made for that case yet. So that's correct. Well, along with that, the draft EIS says no problem under the 2010 guidance. Right. So that project is still in development, and no conformity determination has been finalized. So Petitioner? Yeah, I'm not sure why you stress so much the absence of a conformity determination. I would think the issue is if we can see which way the conformity determination is going to come out, the question would be whether that outcome is affected by this guidance. I agree that in a straightforward project that would be the case, but here with 710 there is a lot of movement in the interagency consultation process as those conformity determinations are being made. So we can't say definitively one way or another what will happen with that project and what the agencies will rely on. You may not know it, but that gives you an argument because it's there to show standing. Yes, that's correct. Our point is that as to the PM10 standard, we can see that there's been an injury with regards to the I-70 project in Colorado. But our fundamental argument here is that because the guidance has no legally binding consequences, the jurisdiction is lacking. Where did you get that in the language relating to 2.5? So I agree with you that on page 38 of the Joint Appendix that the language describing the flexibility of the interagency review process that relates to PM10. But you'll also see earlier in the guidance on pages 5 to 6 of the Joint Appendix, on page 10 it's clear that the guidance is not intended to impose new requirements and that the agencies have discretion to vary from the suggested approach. So where is the language that covers the entire guidance? So on pages 5 to 6 of the Joint Appendix, it makes clear that the guidance is not... 5 is just part of the table of contents. Page 10 makes clear that it's not intended to impose new requirements. And I would also point to... Well, you know, there's the conclusory statement. CAA, the regulations, contain legally binding requirements. This guidance is not a substitute for those, which of course is true. And then there's the conclusory declaration. It's not a regulation in itself. Not legally binding. But what is the... Well, as another sort of sound sort of boilerplate-ish, EPA retains the discretion to allow processes on a case-by-case basis to make it. It doesn't have the sort of broad, hospitable quality of the passage relating to PM10. You're right that that sentence giving the broad discretion falls under the PM10 section. But the regulations themselves prescribe that, and that's 40 CFR 93-105, prescribe that the models, methodologies, and assumptions applied to the conformity determinations for both PM2.5 and PM10, that those are discussed during the interagency review process. And the guidance refers in several points to that regulation, showing that that process is supposed to have flexibility. And in practice, EPA has flexibly applied the guidance. So, I'm sorry. So, the references in the guidance to regulations, and the regulations themselves, you argue, confer the necessary flexibility. Is that right? Yes. So, where in the Joint Appendix do we find the key passages in the regulations? So, the citation I was referring to is 40 CFR 93-105C1I. And I think it's important. Do we have that text somewhere before us? Yes. Yes, it's in the briefs. It's discussed on pages 37 to 38 of the briefs, the role of the interagency review process. And I should note that EPA has applied the guidance as non-binding in practice with regards to the South Mountain Freeway Project. Now, there, the agency that was conducting the conformity analysis came to EPA and said, we are having trouble applying the formula in the guidance. EPA took another look at the guidance, and realized that a different approach would better align with the NAAQS. You're talking about the switch from 2010 to the formula, which is now in the 2015 guidance. Right. The methodology that EPA suggested to South Mountain Freeway is that same methodology that has been suggested in the 2015 guidance. But importantly, EPA did that before the new guidance was issued. And so it really demonstrates the flexibility of that interagency process. And that's important here for two reasons. One is the on-the-ground considerations that make a single formula difficult to prescribe across the board. Because with each of these projects, we have variables like the background levels of the pollutants, meteorological conditions, and the project itself. And so having flexibility in the interagency review process allows both the agencies that are doing the conformity determination, and also the public to have input on which analysis makes the most sense for that project, while still complying with the regulations and the statute itself. And that works both ways. Because, as we were discussing earlier with the 710, the drafts of the conformity analysis are made open to the public for public comment. And at that juncture, EPA and others, including Sierra Club, can describe why it feels that the analysis is incorrect or what can be improved. So that interagency consultation process is important. And at the end of that process, a final conformity determination is made. And at that juncture, once the record has been developed, that determination can be challenged in federal district court. So just because the guidance is not reviewable here, does not mean that it's unreviewable. Specifically, Sierra Club has challenged the conformity determination for the I-70 project in Colorado in district court there. It argues in that case that the conformity determination does not comply with the Clean Air Act. It has likewise challenged the record of decision for the South Mountain Freeway project in district court in Arizona. And while they did not argue in that case that the conformity determination for the project was contrary to law, they could have. No. I'm not sure that that... I mean, if under normal circumstances they have standing here, I'm not sure that they'd lose it because they could have challenged it in another context. No, my point was that it is reviewable elsewhere. Yeah, so we don't have to feel worried about the issue going free of judicial scrutiny. Yes. Yes, exactly. Now, Petitioner raises several issues that they say show that the guidance is binding. One of them is the regulation that provided that a qualitative analysis was permissible until the quantitative guidance was issued. And that once the quantitative guidance was issued, that a quantitative analysis would be required. Now, that does not mean that the quantitative guidance itself has legally binding effect. Its issuance served only as the trigger for a requirement that was provided by regulation. And that regulation was not challenged at the time it was promulgated. Petitioners also argue that the notice and comment process was followed in the issuance of the 2010 guidance. That's not correct. That a draft of the 2010 guidance was made available for public comment, but it was done so only pursuant to a settlement agreement with Sierra Club and EPA and several other agencies. And it was clear in the Federal Register notice seeking comment in the draft guidance and in the final guidance that it was not intended as a regulation and that that same process would not be adhered to in the future. You know, apart from the boilerplate language that you referred to before, and I think it's pretty clear we've looked past boilerplate before. The agency can't get out of the inquiry just by saying this is nonbinding. When you look at JA33, and that's describing the design value for the project in Los Angeles, for the 2.5, right? Right. That language looks very different to me than does the language that Judge Williams referred to and had us look at in JA38 for PM10, whereas the PM10 language is rather expansive and seems to allow many alternatives, invites them. I don't see that in the language for PM2.5. You're correct that that same expansive sentence isn't included under PM2.5, but the suggested methodology is also labeled as a suggested approach. Well, it says you have two options, right? It seems more limiting than the... I can see that the same expansive language that refers to the interagency consultation process isn't included under that section, but there are other aspects of the guidance, which I discussed in my brief, that make clear that this is only intended as a suggested approach. Are there instances in which the regulated entities have followed a different approach and it's been accepted by EPA? The example of that is with the South Mountain Freeway project. The guidance, in effect at the time, required the design value to be calculated by looking at the highest or worst day of pollution for the background level and adding it with the lower level for the project contribution. And there, when the agency reached out to EPA and said, our highest background level violates the NAAQS. So under no circumstances could we construct this project. Even if the project contribution was zero, it would still fail the suggested approach. EPA then worked with the agency, because the agency was right, that it didn't align perfectly with NAAQS and suggested a different approach. So there is give and take there. And importantly, EPA can't enforce the approaches suggested in the guidance. EPA plays an assistive role in the conformity analysis process, but it is not as in Appalachian Power where EPA is in the field enforcing permit requirements. It doesn't have any force. But if EPA says conformity hasn't been achieved, they're out, right? No, that's actually not how it works in practice. So it's the Department of Transportation that makes the final determination. EPA is consulted in that process, but it is a purely consultative role. So EPA can say, no, I don't think that this conformity analysis is proper. I think you failed. And they can still, the Department of Transportation could still find that the project conforms. Has that happened? Has that happened before? That hasn't functionally happened, but it is possible. What did you say? It has not happened where EPA, but it is true that EPA doesn't, you know, for example, in the I-70 project, EPA did not review each aspect of the conformity determination for that project before the determination was made. So it doesn't even functionally work as seek a proof first. What you say sounds as if EPA speaks, people listen. What I'm trying to make clear is that in the I-70 project, EPA did not review all of the data underlying the conformity determination. Or did they review, they didn't review each aspect of it. Yeah, but when they do review and speak, do you know of any instances where the Department of Transportation or someone else has said, no, we're going a different direction? I don't know of any instances where they did it over EPA's objection, but it's possible and permitted by the statute. So obviously you can see, and I hope I'm not misstating Petitioner's argument here, but I think from the viewpoint of the regulated entity, I think they're saying, well, EPA gives us some guidance to do it this way. They say we have some other alternatives to it, but you can't find any instance where another alternative was accepted. They carry a pretty big stick here, so we better do what EPA is saying, so therefore functionally it works more than your guidance. Two things here. First, EPA doesn't have a stick at all. It just has a consultative role. It has no enforcement power. No, but let's be clear. I mean, if EPA says you're not conforming, that's going to end up, for practical purposes, that's going to. . . You said, yeah, theoretically Department of Transportation would say, we hear from the EPA, we just disagree, we're going to go forward, but it doesn't work that way in the real world, does it? What if DOT said, sorry, EPA, you have a voice. No more of this. We're going ahead, end of the litigation. Would DOT's conclusion be upheld? So DOT would have to base its conclusion on the record that it's compiled, so if it had other expert evidence or other sophisticated analysis that it could base, like deviating from the approach, then that would be permissible. But you know of no instances where that's happened in the real world? So with regards to the I-70 project, EPA did not review each aspect. So in practical terms, there, the conformity determination did not have EPA's full review at the time it was published. I'm just imagining I'm an attorney for a regulated entity, and it's hard for me to imagine that I would give advice to the client to do anything other than what the EPA said in its guidance. That seems very risky. So what I think would happen on a practical level is that as part of that interagency consultation process, the state agency or the Department of Transportation would raise questions about their approach and say, we're having problems with this modeling software, for example. Is a different approach appropriate? And that could be part of the discussion. So is it likely that an agency would do that outside of the interagency consultation process, adopt a different approach entirely? Maybe not, but there is certainly room for flexibility, and the South Mountain Freeway Project itself shows that that flexibility has been applied in practice. That an agency came, it had problems with the formula, and that EPA worked with the agency to adopt a different approach than the one issued in the guidance. Counsel, could you help explain this during Appendix 33, the very last line of the text, not the footnote, that the second tier approach that's described in Appendix L, that means what exactly? That seems to be an option. So I can get that if you want. So I'm not prepared today to speak to what that sentence means or what it refers to precisely, but I'm happy to provide the Court with supplemental briefing on that topic if it wishes. You want to wind it up? Oh, sure. My final point is the fact that EPA has provided technical assistance to regulated parties here as a benefit, and it's also beneficial that these formulas be merely a suggested approach to allow for that interagency consultation process to make necessary changes, and also because the underlying modeling software on which these calculations are being made itself changes. So it adds both flexibility to the regulated parties and also to EPA. So the modeling software here, like the MOVE software, that's used to help project what we can anticipate the project will contribute in terms of pollution. And changes are made to that software as technology advances and as the vehicle fleet changes, and it's important to allow EPA the opportunity to update this guidance to reflect the software that's currently in effect. And I would also note that the fact that it's flexible is a benefit to citizen groups as well, because they can comment on the conformity analysis while it's happening and identify concerns that can be then addressed. If there are no further questions. All right. Thank you. I'd like to make three points. First of all, with regard to your questions about whether or not DOT can make these changes and ignore EPA, I think it's clear from the text that you're focused on, Judge Williams, in page 38, that EPA reserves to itself the determination of whether or not any alternative method is acceptable. It says as approved by OEQPS and OTAC. This is not a determination that EPA has deferred to the transportation agencies to make independently from EPA. And that, I think, is a necessary outcome of the legislative history in this case, where Congress resolves some disputes of the kind that you were referring to between EPA and DOT and assigned the responsibility exclusively to EPA to determine what procedures should be applied. And that text preserves that power within EPA. Secondly, in the city of Olmstead case, this court determined that the transportation agencies do not have the power to interpret the Clean Air Act, but only to apply it. And that's definitely relevant to that question. And third, as we've noted in our supplemental brief, EPA did not give any notice in any form, whether it was through notice in common under 553 or in response to the publication obligation under 552A1, that they had changed the guidance procedures that were initially published in the Federal Register in 2010. And until that kind of notice is given, and the Supreme Court made it clear in Morton v. Ruiz, EPA's subsequent actions have no force in effect. Thank you.
judges: Henderson, Griffith, Williams